IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

ANGELA G. HILLIS                    )
                                    )
v.                                  )      No. 2:05-0065
                                    )      Judge Wiseman/Bryant
JO ANNE B. BARNHART, Commissioner   )
of Social Security                  )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB"), as provided under Title II of the
Social Security Act ("the Act"), as amended.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record (Docket Entry No. 15), to which defendant
has responded (Docket Entry No. 16).  For the reasons stated
below, the Magistrate Judge recommends that plaintiff's motion be
GRANTED, and that the Commissioner's decision be REVERSED and the
cause REMANDED for further proceedings consistent with this
report.

## I.  Introduction

Plaintiff filed her DIB application on April 18, 2001,
with a protective filing date of January 31, 2001 (Tr. 55-56).

1

She alleged disability since 1996 due to lupus, osteoporosis, osteoarthritis, Cushing's syndrome, and vision problems (Tr. 64). Her claim was denied at the initial and reconsideration stages of administrative review (Tr. 37, 44). Plaintiff thereafter requested a hearing before an Administrative Law Judge ("ALJ"), which hearing was held on October 6, 2004 (Tr. 299-315). Plaintiff appeared with a non-attorney representative and gave testimony. The ALJ called a vocational expert to testify at government expense. At the conclusion of the hearing, the ALJ took the case under advisement.

On March 25, 2005, the ALJ issued a written decision denying plaintiff's application for benefits (Tr. 14-20). The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on May 15, 1998, and continued to meet them throughout December 31, 2001.

2. The claimant has not engaged in substantial gainful activity since May 15, 1998.

3. From May 15, 1998 to December 31, 2001, the claimant's "severe" impairments were systemic lupus erythematosus (SLE) with associated Cushingoid features, osteoporosis of the lumbar spine with a thoracic compression fracture, osteoarthritis, and a depressive disorder (not otherwise specified,), but she did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4 during that period.

4. As discussed above, the claimant's testimony could not be found fully credible.

5. From May 15, 1998 to December 31, 2001, the claimant retained the residual functional capacity to perform light work activity, with no significant erosion of that capacity by non-exertional

2

impairments, as described above.  20 CFR § 404.1545.

6.  From May 15, 1998 to December 31, 2001, the claimant's past relevant work as a law office receptionist, a general office receptionist, and a note teller could have been performed with the above limitations in accordance with the vocational expert's testimony.  20 CFR § 404.1565.

7.  From May 15, 1998 to December 31, 2001, the claimant's impairments did not prevent her from performing her past relevant work.

8.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision.  20 CFR § 404.1520(e).

(Tr. 19).

On May 13, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 4-6), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.  Id.


## II.  Review of the Record

The parties offered only cursory summaries of the record.  Accordingly, the following more detailed summary is reprinted from the decision of the ALJ (Tr. 15-18).  The "conclusions of law" section of this report further discusses certain particulars not referenced here.  As to plaintiff's medical history pre-dating the period under review, it is

3

remarkable for her 1994 diagnosis with systemic lupus erythematosus ("SLE"), and the longstanding treatment of her SLE symptoms with prednisone, a synthetic steroid (glucocorticoid) with anti-inflammatory and immunosuppressant properties.

From September 1998 to June 1999, the claimant contacted the office of Dr. Lorraine MacDonald, an internist, only for medication refills.  (Tr. 275-288).

In January 1999, when the claimant saw Dr. David Knapp, her rheumatologist at that time, he noted that she was agitated and crying at times because she "was unable to get approved for disability and [wa]s overwhelmed by the amount of generalized pain she ha[d]."  Dr. Knapp also noted that she "was difficult to interview as she ha[d] a steady stream of somatic complaints." After his examination was largely unremarkable, Dr. Knapp stated that she had "a great deal of emotional distress, somatization, *symptom magnification*, and generalized anxiety" (emphasis added). While he did prescribe another medication to ensure he had tried every possibility, Dr. Knapp also considered that she needed psychiatric care.  (Tr. 173-220).

In March 1999, after she was diagnosed with urinary stress incontinence, the claimant underwent an urethropexy, that is, fixation of the urethra and bladder.  (Tr. 113-126).

In September 1999, the claimant saw Dr. MacDonald for abdominal pain and expressed concern about a previously

4

discovered left ovary mass. She said she was seeing a doctor in Nashville, Tennessee, but had not followed up. After her examination was remarkable only for Cushingoid[1] features, Dr. MacDonald ordered computerized tomography (CT) of the abdomen, which revealed a small ovarian cyst. (Tr. 275-288).

In early October 1999, after he diagnosed the claimant with a visually significant cataract of the right eye, Dr. William Stewart, an ophthalmologist, performed a phacoemulsification of that eye with the implantation of an intraocular lens. (Tr. 270-74).

In March 2000, the claimant underwent an echocardiogram, which was grossly normal except for a mild tricuspid regurgitation. (Id.).

A week later, after he diagnosed the claimant with an incisional hernia, Dr. Vaughn Bernard, a surgeon, performed a repair of the hernia. Six weeks later, he described the repair as "solid." (Tr. 113-134).

No evidence was submitted that the claimant ever returned to see Dr. Bernard.

---

[1]"Cushingoid" is defined as "resembling the features, symptoms, and signs associated with Cushing's syndrome." Dorland's Illustrated Medical Dictionary 408 (28th ed. 1994). Cushing's syndrome is "a condition, more commonly seen in females, due ... to prolonged excessive intake of glucocorticoids for therapeutic purposes. The symptoms and signs may include rapidly developing adiposity of the face, neck, and trunk, kyphosis caused by osteoporosis of the spine, hypertension, diabetes mellitus, amenorrhea, hypertrichosis (in females), impotence (in males), dusky complexion with purple markings (striae), polycythemia, pain in the abdomen and back, and muscular wasting and weakness." Id. at 1628.

5

In July 2000, the claimant saw Dr. MacDonald for "numerous complaints."  She said that she had lower abdominal pain especially on the left side, that she had fatigue during the day, that she felt "a bit depressed and tearful at times," and that she had headaches and blurred vision.  The claimant added that she had been taking prednisone for a few years and that her husband said that she snored.  Dr. MacDonald found that she was obese and Cushingoid with a hump of fat tissue on the back of her neck, and stria on her abdomen; the rest of her examination, including the ophthalmologic part, were unremarkable.  Dr. MacDonald diagnosed systemic lupus with chronic steroid use, osteoporosis, osteoarthritis, lower abdominal pain, depression, and vaginal atrophy.  She prescribed medications and ordered dual energy X-ray absorptimetry (DEXA) to review the state of her osteoporosis, a sleep study, and laboratory tests.  Dr. MacDonald referred her to another ophthalmologist for a second opinion and to her gynecologist to see if her left ovary could be causing her abdominal pain.  Two weeks later, Dr. MacDonald noted that the DEXA scan had revealed osteoporosis in the lumbar spine but not in the hip.  (Tr. 135-144, 275-288).

No evidence was submitted that the claimant underwent the sleep study or saw another ophthalmologist.

In October 2000, the claimant saw Dr. Paul Wheeler, a rheumatologist in the same practice as Dr. Knapp.  The results of

6

his examination were essentially the same as Dr. Knapp's except for a small, reducible abdominal hernia. Dr. Wheeler diagnosed systemic lupus erythematosus with diffuse pain and an abdominal hernia and ordered laboratory tests. A month later, Dr. Wheeler noted that DEXA and X-rays of the lumbar spine had revealed osteoporosis and a thoracic compression fracture. He also noted that she wore a back brace and took pain medication. Dr. Wheeler prescribed medications for osteoporosis and began to taper her prednisone. (Tr. 173-220).

In early December 2000, after he diagnosed the claimant with a visually significant cataract of the left eye, Dr. Stewart performed a phacoemulsification of that eye with the implantation of an intraocular lens. (Tr. 145-172).

In February 2001, the claimant went to Dr. Edward Cherney, an ophthalmologist, for an evaluation of blurred vision. After examining her eyes, Dr. Cherney found that her vision could be corrected to 20/40 and that further correction could be achieved surgically. (Tr. 221-234).

In June 2001, at the request of the Social Security Administration, Dr. Linda Blazina, a psychologist, interviewed the claimant, who reported about being unable to work due to "medical problems" and cried while discussing those problems. She added that severe pain and frequent nausea interfered with her activities of daily living and often kept her from leaving

7

her residence. The claimant said that the only mental treatment that she had received was from her primary care physician. Dr. Blazina found her alert, oriented, and talkative with a depressed mood, a congruent affect, good eye contact, normal speech, logical and coherent thought processes, intact reality testing and abstracting abilities, and fair attention and concentration. Dr. Blazina diagnosed a depressive disorder (not otherwise specified); she assigned the claimant a GAF score of 60, which indicated moderate, almost mild, symptoms with the highest score in the previous year being 75, which indicated transient symptoms. Dr. Blazina concluded that her abilities to sustain concentration and persistence and to adapt were limited by pain and by depressive symptoms. (Tr. 235-38).

About a week later, at SSA's request, Dr. Donita Keown examined the claimant, who reported about having lupus, osteoarthritis, osteoporosis, Cushing's syndrome, and poor vision. Dr. Keown noted that the claimant was tearful and hysterical. She found that the claimant was Cushingoid appearing with erythema of her cheeks, stria and tenderness throughout the abdomen, a buffalo hump, and somewhat reduced ranges of motion in the thoracolumbar spine. Dr. Keown also found that she ambulated without difficulty and had joints that were free of inflammation, warmth , or reduced ranges of motion. She concluded that, during an eight-hour workday, the claimant could lift and/or carry 20

8

pounds episodically and 10 pounds routinely, could stand or walk for 6 hours, and could sit for 6 hours. (Tr. 239-242).

Two weeks after that in late June 2001, after reviewing the claimant's medical records, Dr. Frank Edwards, a non-examining state agency psychological consultant, concluded that she had moderate limitations in her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods. Based on his review, Dr. Edwards assessed the claimant's understanding and memory within normal limits; she could sustain attention and concentration, keep to a schedule, maintain attendance and complete a work week without significant emotional difficulty; she had no social or adaptations limitations. (Tr. 257-260).

Three weeks later, after reviewing the claimant's medical records, Dr. Mona Mishu, a non-examining state agency medical consultant, concluded that, during an eight-hour workday, she could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for 6 hours, and could sit for 6 hours. (Tr. 261-68).

9

### III.  Conclusions of Law

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

10

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional

_____

[2]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

11

capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

12

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges error in the ALJ's finding that she failed to follow up on her physician's recommendation that she seek psychiatric treatment, and in his finding that her subjective complaints were not credible in light of the objective medical evidence.  She contends that the treatment of her depression was provided by her physician due to her inability to afford further care, citing her documented concern "about judgments which have been placed against her for collection of bills owed to physicians." (Tr. 236).  She further contends that her subjective complaints are consistent with the diagnoses and restrictions assessed by her treating rheumatologist in 1997, and that those diagnoses and restrictions did not change between 1997 and 2001.  While acknowledging that the physicians employed by the government determined that she had the ability to perform light work,[3] plaintiff contends that these determinations were based upon normal examination findings in her extremities which would not stand to be affected by her impairments.  As explained below, the undersigned finds merit in these arguments, and must recommend reversal of the ALJ's decision.

The issue in this case is the extent of plaintiff's

_____

[3]Light work is defined in the regulations as work which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

Case 2:05-cv-00065   Document 18   Filed 08/22/06   Page 13 of 30 PageID #: 59

subjective limitations -- namely, pain and to a lesser extent fatigue -- resulting from the objectively established medical conditions of SLE and osteoporosis. In this regard, the ALJ's credibility finding is entitled to "great weight and deference," in part due to his opportunity to observe plaintiff's demeanor while testifying. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). This Court is therefore "limited to evaluating whether or not the ALJ's explanations for partially discrediting [plaintiff] are reasonable and supported by substantial evidence in the record." Id.

Where, as here, the record contains objective medical proof of an underlying impairment which could reasonably cause the symptoms complained of, but does not contain such proof as to objectively establish that those symptoms are in fact disabling, the severity of the symptoms is to be evaluated by reference to other factors in addition to the medical evidence, including plaintiff's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve the symptoms. E.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); 20 C.F.R. § 404.1529(b), (c); Social Security Ruling 96-7p, 61 Fed. Reg. 34483, at *34484-34485.

14

While the ALJ made reference to the above regulatory requirements for considering allegations of disabling pain, his findings at step four of the sequential evaluation process are based on the objective proof provided by the consulting physician who examined plaintiff on one occasion at government expense, Dr. Keown (Tr. 239-242), as well as the assessment of the non-examining state agency physician who adopted Dr. Keown's findings (Tr. 261-68). The ALJ further provided the following reasons for his determination, purely related to credibility:

> The claimant's subjective complaints, including pain allegations, were considered as required by the appropriate regulations and rulings including Social Security Ruling 96-7p. As discussed above, [due to the questions asked by her representative at the hearing] the claimant largely failed to discuss the period in question. Further, the objective evidence demonstrates that she was not fully engaged in attempting to improve her condition. Dr. Knapp opined that the claimant demonstrated **symptom magnification** and somatization and recommended psychiatric treatment. However, the claimant did not seek or obtain such treatment other than having an antidepressant prescribed by her primary care physician. The claimant complained about poor vision; yet Dr. Cherney noted her vision was correctable and could be improved with proper treatment. Further, except for seeing Drs. Blazina and Keown at SSA's request, the claimant did not seek any treatment after she saw Dr. Cherney in early February 2001. While the claimant subjectively asserts disability, the objective medical evidence does not support her numerous complaints, which cannot be considered fully credible.

(Tr. 18)(emphasis in original).

As to the medical evidence, plaintiff presented to Dr. Keown on June 13, 2001, complaining of "back pain which she

15

states essentially begins in the back of her head and goes down to the bottom of her tailbone, present constantly, unremitting, worse with any activity." (Tr. 239). She also reported pain in the chest wall, shortness of air at all times, intermittent vomiting and diarrhea, urinary incontinence, fatigue, and weight gain (Tr. 240). However, on examination Dr. Keown noted that her joints were not inflamed, warm, or limited in their range of motion; range of motion was full in her cervical spine, and only somewhat reduced in her lumbar spine; seated straight leg raise testing was negative; she was neurologically normal; and she ambulated well without assistance (Tr. 241). These unremarkable findings led Dr. Keown to assess a capacity for light work (Tr. 241-42). Plaintiff takes issue with this assessment on grounds that her limitations stem from the osteoporosis-induced compression fractures in her thoracic spine, not from any effects felt in her extremities (Docket Entry No. 15, p. 4), and further contends that Dr. Knapp's records support her alleged limitations.

Dr. Knapp initially diagnosed plaintiff with SLE in 1994. His opinions on plaintiff's condition were expressed in correspondence on two occasions. On April 22, 1997, Dr. Knapp wrote the following:

> Angela Hillis continues to be under my care for lupus and at this time, her disease is quite active and I don't believe she is going to be able to do any substantial gainful work on a regular basis due to

16

ongoing symptoms from her lupus. This diagnosis is
based on the clinical presentation plus supporting
laboratory studies which document a clinical picture
compatible with systemic lupus erythematosus.

I feel she has a permanent medical impairment which
does not allow her to compete in the workplace as she
cannot sit or stand for any prolonged period of time
without generalized joint pain and muscle aches, and
she has severe problems with fatigue and constitutional
complaints of low grade fevers which vary from day to
day and are associated with generalized stiffness and
incapacitation.

(Tr. 269). Also on that date, Dr. Knapp examined plaintiff and

reported her statement that "[h]er symptoms fluctuate, and some

days she is totally bed-bound; other days she is able to do

more." (Tr. 182). Dr. Knapp noted puffiness of the fingers and

pain complaints at rest and on motion of all joints, as well as

diffuse tenderness to palpation of the upper and lower back

(Id.). He noted the desirability of getting plaintiff "on a dose

of prednisone lower than the 30 mg she needs to function," and

reiterated his assessment that she would be unable to work at any

job "because of the intensity of her symptoms which fluctuate

greatly." (Id.).

    Plaintiff's next visit to Dr. Knapp was not until

January 26, 1999, at which point she was "in a state of

tremendous emotional turmoil, highly agitated, and crying at

times." (Tr. 179). In a letter to Dr. Macdonald, plaintiff's

primary care physician, Dr. Knapp described plaintiff as follows:

She was unable to get approved for disability and is
overwhelmed by the amount of generalized pain she has.

17

She has not been able to lower her prednisone from 30 mg daily. Otherwise, there has been no major change in her complaints and no new developments since her last visit on April 22, 1997. She is quite concerned about pain across the upper back and neck where she has developed a buffalo hump from the steroids. She is somewhat difficult to interview as she has a steady stream of somatic complaints.

Exam revealed an agitated cushingoid lady with flushed facies and a buffalo hump. Heart is regular. Lungs are clear. No edema is noted. Joint exam is essentially negative for any synovitis. She does not have too much in the way of tender points today. She is crying a great deal of the time and appears to be overwhelmed. I have indicated to her that I felt she was overwhelmed by her circumstances and needed psychiatric care with institution of treatment with SSRIs.

This lady has always been somewhat of a puzzle. Her ANA has been positive although this test is not very specific, but she has always responded to steroids, unlike fibromyalgia patients. I believe there is a great deal of emotional distress, somatization, symptom magnification and generalized anxiety. Nevertheless, I am going to give her a trial of treatment with Arava, the new antimetabolite, as I would not want to overlook anything that might help this unfortunate lady.

(Tr. 179).

Dr. Macdonald had noted unremitting, easily reproducible pain in plaintiff's thoracic spine in March of 1997 (Tr. 281), and in October of that year opined that plaintiff "is now totally disabled." (Tr. 279). In September of 1999, Dr. Macdonald noted that plaintiff "certainly has problems secondary to her steroids including volume overload, Cushing's syndrome, and now advanced osteoporosis." (Tr. 277). In correspondence to plaintiff dated August 11, 2000, Dr. Macdonald noted that

18

plaintiff had lost about an inch and a half of height, and that
bone mineral density analysis had revealed what may have been an
old compression fracture at L1, with the second, third, and
fourth lumbar vertebrae all being "markedly osteoporotic." (Tr.
275). Also during this time period, Dr. Macdonald included
osteoarthritis and kyphosis[4] among plaintiff's diagnoses (Tr.
285), though her kyphosis had been noted as early as 1994 (Tr.
298). In October of 2000, spine films revealed a thoracic
compression fracture, for which the treatment was continued use
of a prescribed back brace, non-steroidal anti-inflammatory
drugs, and pain medication (Tr. 175, 285).

Plaintiff followed up with Dr. Wheeler, another
rheumatologist in practice with Dr. Knapp, on October 10, 2000,
when it was noted that she had pain throughout her spine and a
small hernia in her left lower abdomen (Tr. 177). Dr. Wheeler
was concerned about steroid toxicity due to her inability to
taper the dosage of prednisone, and reiterated that concern in
his treatment note of January 4, 2001:

> Ms. Hillis is having continued problems related to
> steroid toxicities. She has had previous compression
> fracture and is on Fosamax for osteoporosis. She has
> now had cataract surgery on the left eye and has had
> complications in both eyes after these surgeries. She
> is presently on Voltaren eyedrops, as well as
> tetracycline. We had been able to taper her prednisone

---

[4]Kyphosis is defined as "abnormally increased convexity in the curvature
of the thoracic spine as viewed from the side; hunchback." Dorland's
Illustrated Medical Dictionary 890 (28th ed. 1994).

to 30 mg alternating with 20 mg daily. However, when
she went to 30 alternating with 15, she had diffuse
pain in her arms and hands. ... Because of her multiple
toxicities in [the] face of normal renal function and
no internal organ involvement, I feel we must make
every effort to lower her prednisone dose.

(Tr. 174).

After reviewing the medical evidence and making his
credibility determination, the ALJ noted that the May 14, 1998
administrative decision on plaintiff's prior disability claim had
included a finding that she could only perform sedentary work,
but that based on the examination results and assessment provided
by Dr. Keown, medical improvement related to the ability to work
had occurred (Tr. 18). The undersigned must disagree. If
anything, the evidence reflects a worsening of plaintiff's
condition as her osteoporosis/kyphosis advanced to the point of
causing compression fractures in her thoracic vertebrae during
1999-2000. Plaintiff's continued need of high doses of
prednisone to combat the symptoms of her SLE appears to have
impacted several of her body systems, causing or contributing to
plaintiff's osteoporosis, osteoarthritis, kyphosis, cataracts,
facial erythema, bladder incontinence, abdominal pain and striae,
and the fatty deposit referred to as a "buffalo hump." While the
government argues in its brief that Dr. Knapp's opinion as to
disability in April 1997 relates to an earlier time period and is
thus not pertinent to plaintiff's current application for
benefits, that argument fails to consider Dr. Knapp's statement

20

in January 1999 that there had been no change in her complaints
or condition since April 1997, except for her complaint of pain
in the upper back and neck (Tr. 179), which is the location of
the thoracic spine where she was later found to have suffered a
compression fracture.

The ALJ did not give any significant consideration to
this thoracic compression fracture, but appears to have mentioned
it only once in his decision prior to finding it to be a severe
impairment (Tr. 16, 19). It appears that such fractures can be
the source of significant pain, if not unremitting pain. See
Bowman v. Barnhart, 310 F.3d 1080, 1083-84 (8th Cir. 2002)("It is
undisputed that Bowman has several impairments, such as systemic
lupus, compression fractures of the spine, kyphosis, which alone
or in combination, could cause chronic pain. ... Dr. Cooper
explained that although Bowman may have periods of relief from
her compression fractures, because of her osteoporosis, any minor
trauma could cause more fractures resulting in more pain.");
McKenzie v. Chater, 1996 WL 1826, at *1 (6th Cir. Jan. 2,
1996)(quoting the criteria of former listing 1.05B
(Osteoporosis), chief among which are compression fractures of
vertebrae).[5]  While it is true that Dr. Knapp did not give a

_____

[5]While plaintiff would appear to have been a candidate for at least
equivalence to the criteria of former listing 1.05B, which was deleted after
she filed her application but before her ALJ hearing, the Sixth Circuit has
now settled that the Commissioner's policy of applying such rule changes to
pending claims is not impermissibly retroactive. Combs v. Comm'r of Soc.
Sec., --- F.3d ----, 2006 WL 2355590 (6th Cir. Aug. 16, 2006)(en banc).

21

function-by-function assessment of plaintiff's work-related abilities, he is a treating specialist who, along with plaintiff's primary treating physician, opined that plaintiff was disabled in 1997, without the benefit of any evidence of compression fractures. Particularly where the disease is, as Dr. Knapp specifically stated, a relapsing/remitting one with great fluctuation in symptoms, it would appear that some further development of the record would be needed to sustain the finding of the ALJ, which was based on the examination findings of a one-time consultant.

As far as the remainder of the ALJ's credibility analysis, he does not appear to have factored in plaintiff's daily activities, which are by all accounts highly restricted (Tr. 78, 237, 305-06). Rather, the ALJ seized on other factors which he felt undermined plaintiff's credibility. As discussed below, these factors do not substantially support his decision.

The ALJ faulted plaintiff for failing to testify regarding the period of her insurance for benefits, which ended on December 31, 2001, focusing instead on her condition in 1996 and at the time of the hearing in 2004 (Tr. 18). However, he noted that this was due to the questions asked by her non-attorney representative, rather than any evasiveness on plaintiff's part. With all due respect, it would seem that the ALJ's duty to fully and fairly develop the record would include

22

an obligation to direct a claimant's attention (or that of her representative, particularly where the representative is not an attorney) to the pertinent time period. While the transcript of plaintiff's hearing includes a reference to "an off the record discussion essentially about the evidence in this case" (Tr. 301), there are no recorded instances of the ALJ defining the time period at issue, either as a preliminary matter or anywhere during or after the scant five transcribed pages of examination by plaintiff's representative. Notably, the ALJ's own brief examination of plaintiff (Tr. 309-310) was almost entirely directed to plaintiff's current condition, rather than her condition prior to 2002.

The ALJ further rested his credibility finding on his perception that plaintiff "was not fully engaged in attempting to improve her condition." (Tr. 18). He noted that plaintiff had not sought the psychiatric treatment recommended by Dr. Knapp, but was apparently satisfied to receive the treatment with antidepressants provided by Dr. Macdonald. He further noted that plaintiff had not sought further physical treatment after February 2001, quoting plaintiff's response when queried about this lack of treatment as "doctors just told her the same thing: 'blah, blah, blah'" (Tr. 18). However, it appears that Dr. Knapp instructed plaintiff to follow up with Dr. Macdonald for a referral to a psychiatrist and the institution of treatment with

23

antidepressants (Tr. 180). Dr. Macdonald's treatment notes do not indicate that any such referral was ever made. It is entirely possible that Dr. Macdonald did not support Dr. Knapp's recommendation for psychiatric treatment, and if that is the case, plaintiff's decision to accept her primary care physician's judgment and treatment with respect to her mental impairment should not be held against her.[6] Moreover, the palpable frustration inherent in plaintiff's reasoning and testimony (Tr. 309-310) as to her failure to seek any physical treatment beyond the continuation of her prescriptions is entirely understandable: SLE is a chronic disease, the only semi-successful treatment of which has been achieved by sustained high dosage of prednisone, which has itself spawned a variety of serious side effects, and the only alternative to steroid therapy which has apparently been offered is chemotherapy, which plaintiff is reluctant to try for fear of leaving the frying pan for the fire (Id.). Nowhere in this vicious cycle does there appear to be grounds for the conclusion that plaintiff would prefer to maintain the status quo and receive benefits, rather than improve her condition and go to

---

[6]Indeed, Dr. Knapp's observation of somatization and symptom magnification is the lone reference to such phenomena in the medical record. Dr. Macdonald never made such diagnoses or observations. In any event, the connection between the failure to pursue psychiatric treatment and the credibility of plaintiff's pain complaints is tenuous at best. See Groskreutz v. Barnhart, 2004 WL 1943249, at *5 (7th Cir. Aug. 26, 2004)("Finally, the ALJ deemed significant the fact that Groskreutz failed to seek prescribed group therapy treatment for her depression and anxiety; but this reason has nothing to do with the credibility of Groskruetz's testimony regarding her pain.").

24

work.

Also along these lines, the ALJ noted that Dr. Cherney
(an ophthalmologist who was consulted by plaintiff's optometrist,
Dr. Wardlaw) found that plaintiff's "vision was correctable and
could be improved with proper treatment." (Tr. 18). In fact,
however, Dr. Cherney found that plaintiff "has some decreased
vision, but the super pinhole got her to 20/40," and noted that
"[s]he may possibly improve her vision if the capsule was opened
in the left eye, and more so in the right eye." (Tr. 222). To
the extent that the results of "the super pinhole" test mean that
plaintiff simply needs an updated prescription in her glasses to
achieve 20/40 vision -- as surmised by the ALJ when he stated
that "Dr. Cherney found that her vision could be corrected to
20/40 and that further correction could be achieved surgically"
(Tr. 17) -- there would be some justification for the ALJ's
finding that plaintiff's complaints of poor vision had been
rebutted. However, neither Dr. Cherney's report nor the records
of Dr. Wardlaw (Tr. 222-234) inescapably support this conclusion.
Moreover, any inclusion of the referenced capsule-opening
procedure in the "proper treatment" which might improve
plaintiff's vision is clearly misplaced, as such a procedure was
described by Dr. Cherney as a measure which "may possibly"
improve her vision, and plaintiff would understandably be
reluctant to undergo another procedure (particularly with such an

25

equivocal pre-operative prognosis) to correct what appears to have been a side effect of her previous cataract surgery. Indeed, while not included in the ALJ's summary of the evidence, the record shows that plaintiff had already undergone such a procedure in December of 2000, when a YAG capsulotomy was performed on plaintiff's right eye to remedy "cloudy posterior capsule" (Tr. 165-66), an apparently frequent side effect of cataract removal surgery.[7]  While this procedure may have been successful, as Dr. Wardlaw appears to have diagnosed bilateral haziness in the *anterior* vitreous face in January of 2001 (Tr. 226), the undersigned simply cannot find substantial evidentiary support for the proposition that the credibility of plaintiff's vision complaints should suffer for Dr. Cherney's notation that her vision "could be improved with proper treatment" (Tr. 18).

Finally, it appears that the lynchpin of the adverse credibility finding in this case is Dr. Knapp's notation of what he believed to be significant somatization and symptom magnification (Tr. 179).  The ALJ added emphasis in the typeface on the two occasions in his decision where he referenced "symptom magnification," once in his summary of the evidence and once in support of his credibility finding (Tr. 15, 18).  It bears noting that Dr. Knapp's reference to somatization and symptom magnification is not repeated in the record, but is an isolated

_____

[7]See http://www.answers.com/topic/eye-surgery#wp-_note-5

suspicion that is not accompanied by any corresponding diagnosis. Moreover, to the extent that the ALJ viewed the suspected symptom magnification as synonymous with malingering, the record does not support such an inference. Malingering is "the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury, done for the purpose of a consciously desired end." <u>Dorland's Illustrated Medical Dictionary</u> 982 (28th ed. 1994). Somatization and symptom magnification, on the other hand, are psychiatric phenomena whereby symptoms are felt or expressed more acutely than would be expected due to the physical malady itself. <u>See</u> <u>Carradine v. Barnhart</u>, 360 F.3d 751, 754-55 (7th Cir. 2004); <u>Groat v. Barnhart</u>, 282 F.Supp.2d 965, 973 (S.D. Iowa 2003)(consulting doctor found evidence of symptom magnification, but stated that "this diagnosis is not intended to discredit her complaint of pain. The diagnosis is not intended to suggest an intentional misrepresentation of pain and disability, but more likely represents a learned pattern of illness behavior."). It is true that, in the case of symptom magnification, the expression of pain is inconsistent with what is actually being felt; thus, it may not be inappropriate to weigh such a finding in the credibility analysis. <u>See</u> <u>Pierce v. Louisiana Maintenance Serv.,</u>

Case 2:05-cv-00065   Document 18   Filed 08/22/06   Page 27 of 30 PageID #: 73

Inc., 668 So.2d 1232, 1238 (La. Ct. App. 1996).[8]  However, in
this case, it is clear that Dr. Knapp did not doubt the sincerity
of plaintiff's hysterical presentation on January 26, 1999 -- he
even prescribed a new drug on that day to treat her SLE symptoms
(Tr. 179).  Dr. Knapp's conviction that a component of
plaintiff's pain was of psychiatric origin was clearly not
intended as a challenge to the authenticity of her complaints,
and the mere fact that such symptoms may have been magnified does
not suffice to support the ALJ's decision on the record as a
whole, where his explanations for partially discrediting
plaintiff are not otherwise reasonable or supported by
substantial evidence.

　　　In sum, the undersigned must conclude that the ALJ's
findings on the extent of plaintiff's pain and resulting

---

[8]While Pierce is not a social security case but a worker's compensation
case, its analysis of the issue of symptom magnification in the context of a
credibility finding (as opposed to the context where such a finding is used to
justify giving less weight to another item of medical evidence pertaining to
the plaintiff's pain) is instructive:

　　　We are aware that claimant was generally found to be cooperative
　　　during his treatment and testing; as we understand "symptom
　　　magnification," however, the cause can be psychological or
　　　"hysterical" and not necessarily deliberate malingering.  To the
　　　extent that the trial court questioned the credibility of the
　　　appellant, however, we find that there was a reasonable, factual
　　　basis for such question--objective medical measurement of
　　　subjective and inconsistent responses.  The court clearly
　　　concluded that the claimant, for whatever reason, magnified his
　　　complaints of pain and the extent of his physical limitations.  We
　　　cannot say that such determination relative to credibility is
　　　clearly wrong in the present case.  Reviewing the record in its
　　　entirety, we find that there was sufficient evidence before the
　　　court upon which to base the finding [of no entitlement to
　　　benefits].

limitations are not supported by substantial evidence.  While the
record is not so one-sided as to support a judicial finding of
entitlement to benefits, see Faucher v. Sec'y of Health & Human
Svcs., 17 F.3d 171, 176 (6th Cir. 1994), this case should be
remanded for further administrative factfinding, including
updating the medical record of plaintiff's impairments during the
limited period under review, if possible; reconsideration of
plaintiff's objectively established conditions and subjective
complaints pursuant to regulatory standards; and the issuance of
a new decision.

### IV.  Recommendation

        In light of the foregoing, the Magistrate Judge
recommends that plaintiff's motion for judgment on the
administrative record be GRANTED, and that the decision of the
Commissioner be REVERSED and the cause REMANDED for further
proceedings consistent with this report.

        Any party has ten (10) days from receipt of this Report
and Recommendation in which to file any written objections to it
with the District Court.  Any party opposing said objections
shall have ten (10) days from receipt of any objections filed in
which to file any responses to said objections.  Failure to file
specific objections within ten (10) days of receipt of this
Report and Recommendation can constitute a waiver of further

appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140

(1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en

banc).

      **ENTERED** this 22nd day of August, 2006.


                     s/ John S. Bryant
                  JOHN S. BRYANT
                  UNITED STATES MAGISTRATE JUDGE